## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **BRUHN NEWTECH, INC.** | ) | |
| **14438 Whitemoss Terrace** | ) | |
| **Lakewood Ranch, FL 34202,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. _____** |
| **v.** | ) | **Judge _____** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

COMES NOW the Plaintiff, Bruhn NewTech, Inc., by and through its undersigned attorneys, and files the following Complaint against Defendant, the United States Marine Corps ("USMC"), a division of the U.S. Department of Defense ("DoD"), (hereinafter "Defendant" or "USMC" or "Government"), and respectfully states to this Honorable Court:

### NATURE OF THE ACTION

1.      This is an action for relief under the Contract Disputes Act, 41 U.S.C. § 609 ("CDA") and the Tucker Act, 28 U.S.C. § 1491.

2.      This action seeks review of the Contracting Officer's Final Decision (the "Decision") concerning a claim under Contract N0. M67854-98-C-2076 (the "Contract") submitted by Plaintiff to Defendant on August 31, 2015.  The certified claim submitted to the Contracting Officer was for breach, by the government, of a software license that was contained within the Contract, by the unauthorized publication and distribution of software code that BNT-US delivered to the government pursuant to the Contract.

1

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

3.     The Contracting Officer's Decision denied the claim on January 8, 2016.

**JURISDICTION**

4.     This Court has original jurisdiction over this matter pursuant to the Tucker Act, 28 U.S.C. § 1491.

5.     This Court also has jurisdiction over this matter pursuant to the Contracts Disputes Act of 1978, 41 U.S.C. § 7104(b).

**THE PARTIES AND FACTUAL BACKGROUND**

6.     Plaintiff Bruhn NewTech, Inc. ("BNT-US" or "Plaintiff") is a Delaware corporation that maintains its principal place of business in Florida at the address set forth in the case caption.  BNT-US is a wholly owned subsidiary of Bruhn NewTech A/S ("BNT-Denmark"), a Danish corporation.

7.     Both BNT-US and its corporate parent, BNT-Denmark, are in the business of marketing and selling commercial computer software created by BNT-Denmark, which is sold worldwide and is utilized in military systems that track and analyze chemical, biological, radiological and nuclear agents ("CBRN") in battlefield or civilian environments.

8.     On April 17, 1998, Plaintiff submitted a proposal to Defendant in response to Solicitation M67854-98-R-2076. A copy of the Proposal is attached hereto as Exhibit ("Ex.") A.

9.     On May 13, 1998, Defendant awarded Plaintiff the Contract. A copy of the Contract is attached hereto as Ex. B.

10.     The Contract was for the development of the Joint Warning and Reporting Network ("JWARN") commercial software.  Ex. B, Purchase Description at 3; Ex. B, Statement of Work ("SOW"), at 3).

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

11.    The relevant software purchased by Defendant was identified by Plaintiff as "Bruhn NewTech NBC Analysis software," (Ex. A, at Purchase Description, at 3) and "NBC-ANALYSIS" software, (Contract, at 2).

12.    Plaintiff was required to deliver "the commercial software component of JWARN, the NBC Analysis program, and subsequent post-fielding support." (Ex. B, SOW, at 3).

13.    Plaintiff's tasks, set out in the SOW, included "but [were] not limited to, the delivery of the NBC analysis (NBCA) software packages, software maintenance and upgrades, contractor support, and training." (Ex. B, SOW, at 3)

14.    During the software maintenance and upgrade task of the Contract, the NBC Analysis software was re-designated as "CBRN-ANALYSIS" software. The term "Software" herein refers to the subject software licensed by Plaintiff to Defendant under the Contract, regardless of whether designated as NBC Analysis software or CBRN-Analysis software.

15.    Pursuant to the Contract, the Defendant purchased commercial Software "packages ([including] license, media, documents)," and certain training manuals, materials, and support. (Ex. B, SOW, at 3-4).

16.    The Contract included the following Contract Line Item Numbers ("CLIN"):

a.   CLIN 0001 is for "NBC Analysis Software IAW Statement of Work 3.1.2." (Ex. B, at 2).

b.   CLIN 0004 identifies the Software as commercial, stating it is for "Commercial Software Manual 1AW Ex. B and C DD 1423 [sic]." (Ex. B, at 2).

c.   CLIN 0005 is for Software Upgrade and Maintenance. (Ex. B, at 3).

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

17.     The Contract incorporates Federal Acquisition Regulation ("FAR") clause 52.227-19 "Commercial Computer Software—Restricted Rights (June 1987)". (Ex. B, at 11).

18.     The Contract's commercial License Agreement, incorporated pursuant to FAR 52.227-19, granted the Government a commercial, restricted, national license to use the Software. (Ex. B, at 13-14).  (the Contract's commercial License Agreement, modified in accordance with FAR 52.227-19, and as agreed to by Defendant, shall be referred to herein as the "Software License"). For purposes of convenience the Software License, identified in the Contract as "License Agreement (Supplement to FAR 52.227-19)," is attached separately hereto as Exhibit C.

19.     Mark R. Crawford was the Contracting Officer for the Contract.  According to the Contract, his mailing address was:

> Mark R. Crawford
> Contracting Officer
> Marine Corps Systems Command
> 2033 Barnett Avenue
> Suite 315
> Quantico, VA 22134-5010

20.     The Software has been used continuously by Defendant since the date of Contract award to integrate CBRN data, sensor alert information, and observation reports from battlefield or civilian environments, and to generate plots of the hazard area and warning messages to military units or civilian authorities to warn of CBRN hazards.

21.     After the date of Contract award, DoD established a Joint Program Executive Office as a single focal point within the United States armed forces to centralize all research, development, acquisition, fielding and life-cycle support of chemical and biological defense equipment and medical countermeasures.  Within this Joint Program Executive Office, seven Joint Project Managers lead,

4

manage and direct the acquisition and fielding of chemical and biological detection and reconnaissance systems, individual and collective protection systems, decontamination systems, information management systems, medical devices, drugs and vaccines, installation and force protection systems, and other systems.

22.     In or about 1998, operations of DoD's Joint Warning and Reporting Network ("JWARN"), where the Software is deployed, was transferred to the Joint Program Manager – Information Systems ("JPMIS") -- one of the seven Joint Project Managers established and managed by DoD. Although operations of the program are now housed under JPMIS, based upon recent correspondence Plaintiff believes that contract management functions for the program remain with the USMC.  The address of the JPMIS is:

> Joint Program Manager – Information Systems
> 4301 Pacific Highway
> OT-1, 2nd Floor, Room 2250 D
> San Diego, CA. 92110

23.     This is a claim for breach of the Contract under the CDA.  The United States, both on its own and through contractors acting for the United States with its authorization and consent, breached the Contract by breaching the Software License by misusing the Software in a manner that would subject the United States to liability if it were a private party.

24.     Pursuant to the CDA, contractor claims against the Government are to be submitted, in writing, to the contracting officer for a decision within six years after accrual of a claim.  *41 U.S.C. § 7103(4)(A); Federal Acquisition Regulation ("FAR") § 33.206*.

25.     A timely certified contract claim was filed with the contracting officer by Plaintiff within the statutory six year claim period, by delivering notice of claim to the Government on August 31, 2015.

5

On that date, Plaintiff submitted a certified claim against the Government for breach of the Contract, by delivering a copy of the claim document attached hereto as Exhibit D, and the exhibits referenced within the claim document (together, the "Claim"), to the address for the Contracting Officer stated in the Contract. On the same day, Plaintiff also delivered a copy of the Claim to the Joint Program Manager – Information Systems ("JPMIS") in San Diego. On November 5, 2015, Plaintiff thereafter also submitted a copy of the Claim to the Joint Program Executive Office for Chemical and Biological Defense ("JPEO-CBD").

26. Sixty days elapsed, following submission of the Claim on August 31, 2015, without Plaintiff receiving any decision or communication from the Contracting Officer as required by 41 USC § 7103(f). In order to ensure that the Contracting Officer had a full and adequate opportunity to review the Claim, undersigned counsel re-submitted the same Claim to the Contracting Officer, to JPMIS, and to another USMC acquisition office, with cover letters "request[ing] that the recipient(s) of this letter immediately forward this letter, and all enclosures, to the Contracting Officer for Contract No. M67854-98-C-2076 (awarded on May 13, 1998), or to his designated successor," and "request[ed] a final decision on the Claim that is enclosed with this letter."

27. On January 8, 2016, a copy of the contracting officer's final Decision on the Claim was delivered to undersigned counsel by electronic mail. A copy of the contracting officer's Decision is attached hereto as Exhibit E. By this Decision, the contracting officer acknowledged that the Claim is properly certified and timely, but denied the certified Claim in its entirety.

28. On January 19, 2016, BNT-US initiated an action in this court, styled *Bruhn NewTech, Inc. v. The United States*, U.S Court of Federal Claims, Case No. 1:16-cv-00092-MBH (the "First Court

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

of Federal Claims Action"). The government filed a motion to dismiss that action on March 21, 2016. On June 15, 2016, BNT-US exercised its right, under Rule 41(a), to dismiss the First Court of Federal Claims Action without prejudice, and the First Court of Federal Claims Action was thereafter dismissed, without prejudice, on June 24, 2016. The present action arises from the same occurrences as did the First Court of Federal Claims Action, and has been filed after the voluntary dismissal of a related action in the U.S. District Court for the District of Maryland, *Bruhn NewTech A/S v. The Johns Hopkins University Applied Physics Laboratory LLC*, Case No. 1:15-cv-00671-GLR.

### THE SOFTWARE LICENSE

29.     The Software is the primary product of BNT-Denmark, which is the proprietor of registered copyrights in the United States on the computer source code within the Software. Development of this software source code was completed in 2008, and the Software was first published on January 12, 1999. BNT-Denmark thereafter made refinements and improvements to the code, updating the Software at least once per year for its customers. In 2014, BNT-Denmark gained United States copyright registration both for the software code as it existed when first published in January 1999 (U.S. Copyright Reg. No. TX0007836500), and also for all updates and improvements that were made to the software code thereafter, up until the time of the acts of breach and infringement alleged in this Complaint (U.S. Copyright Reg. No. TX0007836490).[1]

---

[1] The last-in-time update to the Software by BNT-Denmark, prior to the May 2013 acts of breach and infringement alleged in this Complaint, was published by the company on September 28, 2012. Effective April 28, 2014, BNT-Denmark gained copyright registration of all of the updates and improvements that had been made to the software code after completion of the Software in 1998, through May 2013 (U.S. Copyright Reg. No. TX0007836490). Expressly excluded from this

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

30.    For many years, including the years 1998 to the present, BNT-Denmark has authorized Plaintiff to market and sell Software licenses to countries and government organizations outside of Europe.  During the same period, BNT-Denmark has marketed and sold Software licenses to countries and organizations in Europe.

31.    The Software is offered for licensure by Plaintiff in two formats: "dongled" and "undongled."  Dongled versions of the Software are protected by a hardware dongle, which prevents the dongled Software from being replicated, copied or further distributed beyond the computer(s) on which it is initially loaded.  Dongled versions of the Software have been sold by BNT-Denmark for use in 23 NATO nations, and have also been sold to at least eight non-NATO nations.

32.    When Plaintiff negotiates a license of the Software to a nation for use throughout the nation's armed forces and government, Plaintiff undertakes such a sale in conjunction with a national license, pursuant to which the Software may be freely used throughout the nation's armed forces and government, but only in a manner consistent with the terms of the negotiated national license.  For sales under a national license, an "undongled" version of the Software is delivered to the purchasing nation. Undongled versions of the Software have the physical capacity to be replicated and copied, but the terms of the license under which the Software is delivered prohibit replication or distribution of the Software other that in strict compliance with the license.

registration No. TX0007836490 was the original software code that had been completed in 1998. Effective as of the same date, however, BNT-Denmark also registered the original version of the Software that was completed in 1998 and published in 1999 (U.S. Copyright Reg. No. TX0007836500). Thus, the Software as it existed on the date of the Contract is the subject of a US copyright registration, as are all updates and improvements made to the Software after that time and through the date of the relevant acts of breach and infringement.

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

33.     Plaintiff relies on adherence to the terms of the national license to prevent unauthorized replication, copying or further distribution of the Software in these circumstances.  The license terms for undongled versions of the Software include contractual guarantees that the licensee government shall not permit the Software to be distributed beyond the nation's armed forces (or other governmental organizations described in the license).  It is vital to Plaintiff's business that the Software be protected from unauthorized copying or distribution, since unauthorized copying or distribution will substantially harm or destroy the market for future licensure of the Software. It is for this reason that Plaintiff incorporated the Software License Agreement (Ex. C) in the Contract.

34.     The Contract is a fixed price contract.  Pursuant to the terms of the Contract and the Software License Agreement contained therein, Plaintiff provided the Software to the United States Government in "undongled" form.

35.     The Software License Agreement provides:

> All software to be delivered under this contract including source codes, is commercial computer software subject to restricted rights specified in FAR 52.227-19 "Commercial Computer Software—Restricted Rights" with the following additions to that clause:
>
> 1.  The Government may make an unlimited number of copies of the software and may distribute and use the software in any computers owned or leased by the Government and operated by the U.S. Government personnel working for U.S. Government departments, organizations and agencies;
>
> 2.  The Government's use of the software shall be limited to use in fulfillment of functions of the Government of the United States;
>
> 3.  The Government shall not disclose the software and shall not give, sell, license or otherwise provide copies of the software or use of the software to any third party person or entity including but not limited to members of the public, governments of foreign countries, or international agencies or organizations.

9

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

(Ex. A, at 66-67, Ex. B, at 13-14; Ex. C).

36.     At all times, Plaintiff complied with the requirements of the Contract, including but not limited to delivering the Software to the government, providing training materials, a software manual and a training course, providing upgrades and maintenance during relevant time periods, and placing the following legend on copies of the Software that were provided to the Government:

> COMMERCIAL COMPUTER SOFTWARE
> RESTRICTED RIGHTS
>
> Notwithstanding any other lease or license agreement that may pertain to, or accompany the delivery of, this computer software, the rights of the Government regarding its use, reproduction and disclosure are as set forth in Government Contract No. M67854-98-C-2076.

(Ex. A, at 66, Ex. B, at 13; Ex. C, p. 1.

## APPEAL ISSUES

### BREACH OF THE SOFTWARE LICENSE

37.     The Joint Warning and Reporting Network ("JWARN") program that has deployed the Software since 1998 within the U.S. military has been managed by JPMIS since at least the start date of the Contract.  JPMIS is staffed by a combination of uniformed military and civilian government employees, along with outside Systems Engineering and Technical Assistance (SETA) contractors (SETA contractors are civilian employees or government contractors who are contracted to assist the Department of Defense pursuant to FAR Part 37).

38.     The Software has been used continuously by Defendant since the date of Contract.

39.     In the context of the Korean theater of United States military operations, the CBRN program is known as "JWARN Block 1F Signal Fire."  One of the SETA contractors working for and under the direction of DoD to support JWARN Block 1F Signal Fire in South Korea has been The Johns

10

Hopkins University Applied Physics Laboratory, LLC, a Maryland limited liability company ("JHU APL"). JHU APL worked closely with and/or supervised other SETA contractors within the JWARN Block 1F Signal Fire program, including Group W, Inc. ("Group W"), Sentek Global ("Sentek"), and SAIC, Inc. Following the actions alleged in this Complaint, SAIC, Inc. underwent a corporate re-organization which, upon information and belief, resulted in Leidos, Inc. being the successor-in-interest to SAIC, Inc. Within this complaint, the term "SAIC/Leidos" shall refer both to Leidos, Inc., and to its predecessor-in-interest which employed Michael S. Meyer during relevant time periods.

40. During relevant time periods, an employee of SETA contractor SAIC/Leidos, Michael S. Meyer ("Mr. Meyer"), served as the Deputy Assistant Program Manager ("DAPM") for the JWARN Block 1F Signal Fire program. Group W employee Mark White was a software engineer supporting the USFK CJ35 Plans Operations Analysis Branch in South Korea, and in that capacity provided support for JWARN Block 1F Signal Fire computers, servers and networks. Mark White reported to Marvin L. ("Marty") Sikes ("Mr. Sikes"), an employee of JHU APL. Sentek employee Paul Moroney ("Mr. Moroney") also provided training and other support services to JWARN Block 1F Signal Fire computer users.

41. Plaintiff first learned of the Government's breach of the Software License in March 2013, when Mark White informed Plaintiff that the Software was loaded onto several computer hard drives that were designated to be delivered to Republic of Korea ("ROK" or "South Korea") armed forces within laptop computers that would be operated by South Korean forces without oversight or monitoring by DoD. (Declaration ("Decl.") of J. Rohrback, at Para. 2, attached hereto as Exhibit F).

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

42.     The Software was loaded onto these computer hard drives by Mark White and/or Mr. Moroney, at the direction of Mr. Sikes, and the hard drives were stored briefly in a secure safe by Mark White.  Shortly thereafter, at the direction and with the approval of Mr. Sikes and Mr. Meyer, these computer hard drives were installed in laptop computers delivered to ROK armed forces. Ex. A to Decl. of J. Rohrback (within Ex. F hereto).

43.     Mr. Sikes and Mr. Meyer had knowledge of the terms of the Software License, and knew that provision of the Software to ROK armed forces would violate the terms of the Software License. The Government, through these contractors, nonetheless caused or permitted the computer hard drives containing the Software to be installed on laptop computers destined for ROK armed forces, and allowed those computers to be removed by ROK armed forces without monitoring or escort.

44.     Upon learning from Mark White of the breach of the Software License, Plaintiff promptly contacted Mr. Meyer, in his role as DAPM for the JWARN Block 1 Program, and asked a number of questions seeking clarification of whether the DoD and its contractors had transferred the Software to ROK armed forces in violation of the terms of the Software License.  Attached hereto as Exhibit A to the Declaration of J. Rohrback (within Ex. F hereto) is an email exchange between Mr. Meyer and Joshua Rohrback of Bruhn NewTech ("Mr. Rohrback"), in which Mr. Meyer (an employee of SETA contractor SAIC/Leidos) communicates through an "@jpmis.mil" email account.  In the correspondence, Mr. Meyer acknowledges that, as of March 12, 2013, at least five to ten laptop computers containing the Software were provided by DoD to ROK armed forces, "where they can use/operate the laptops without [United States Government] intervention or supervision."  (p. 2 of Ex. A to Decl. of J. Rohrback (within Ex. F hereto)).  Mr. Meyer further states that he was aware of no

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

physical protections utilized on the subject laptops to prevent the hard disks from being removed and cloned. "The entire laptop [was provided to ROK armed forces], pre-built with all software pre-installed and configured. Basically a turn-key system." *Id.* In the same email exchange, Mr. Sikes confirms that ROK armed forces were given seven laptops containing the Software, and states that he was attempting to track those laptop computers. In this email exchange, Mr. Sikes (an employee of SETA contractor JHU APL) communicates through a "@korea.army.mil" email account.

45. In or about May 2013, Plaintiff also became aware that DoD had provided copies of the Software to the air force of the Kingdom of Jordan, in breach of the Software License. Bruhn NewTech initially provided training and technical support to DoD for the Software, pursuant to the Contract, but DoD later contracted with Sentek to provide these training and technical support services. Attached hereto as Exhibit B to the Declaration of J. Rohrback (within Ex. F hereto) is an email string, including an email sent on May 21, 2013 from Mr. Meyer to Mr. Rohrback. Mr. Meyer attaches to this email a string of earlier emails among Sentek personnel, which establish that Sentek was providing training and technical support for the Software to the Jordanian Air Force at that time, even though Plaintiff has never licensed the Software to the Kingdom of Jordan. Within these emails, Mr. Moroney states (on May 6, 2013) that "we were in Jordan a few weeks ago training the [Jordanian Air Force] on our products: JWARN 1F…" He goes on to relate that he has "a task to build the Laptops with JEM/JWARN on it from the JPEO and CENTCOM [the United States Central Command]." The remaining emails in the string reflect that Sentek engaged in troubleshooting and remedial action to correct problems encountered by the Jordanian Air Force and contractors in using the Software. Neither BNT-US nor BNT-Denmark has licensed the Software to the Kingdom of Jordan or its armed forces.

13

The email string attached hereto as Exhibit B to the Declaration of J. Rohrback (within Ex. F hereto) indicates that DoD breached the terms of the Software License, in or before May 2013, by distributing the Software to the Jordanian Air Force.

46.     The versions of the Software transferred by the United States Government to the ROK and to the Kingdom of Jordan in or before March 2013 were un-dongled, with no hardware technical controls that would prevent it from thereafter being widely copied and distributed across ROK or Jordanian agencies or armed forces.

47.     The versions of the Software transferred by the United States Government to the ROK and to the Kingdom of Jordan in or before March 2013 incorporated not only the software code as it existed when first published in January 1999 (later registered as U.S. Copyright Reg. No. TX0007836500), but also software code updating and upgrading the original code (later registered as U.S. Copyright Reg. No. TX0007836490). These updates were delivered to the United States Government pursuant to a series of contracts dated after the Contract, by which the United States Government obtained updates or upgrades to specific functionality within the Software, without fundamentally changing the original software. Within all of these subsequent contracts, the United States Government acknowledged and affirmed its ongoing obligations under the Contract and the incorporated Software License.

48.     At no time has Plaintiff authorized the United States Government to distribute the Software to the ROK or Jordanian governments, agencies, or armed forces, and at no time has the Software License been modified to allow such unlicensed distribution.

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

## THE CONTRACTING OFFICER'S FINAL DECISION

49.     The Contracting Officer, in his Decision, denied the Claim in its entirety. (Ex. E, at 8).

50.     In the Decision, the CO agreed that "[t]he supplemental commercial computer software restricted rights dated April 17, 1998 in [the Contract] purports to restrict the Government from disclosing, giving, selling, licensing, or providing copies of the software to foreign countries or international organizations."  (Ex. E, at 6).

51.     The CO also agreed that "The supplemental commercial computer software restricted rights dated April 17, 1998 [in the Contract] refer to a contract line item number for 'Software Upgrade & Maintenance.'" (Ex. E, at 6).

52.     Notwithstanding the above, the CO challenged the validity of the Software License by stating that:

   a.    "[T]he supplemental commercial computer software restricted rights dated April 17, 1998, . . has a hand-written change from CLIN 0009 to CLIN 0005 as well as the hand-written initials "BPW." *Id.*  (There is no "CLIN 0009" in the Contract).

   b.    "Neither Crawford's signature nor initials appear in the supplemental commercial computer software restricted rights dated April 17, 1998 in [the Contract]." *Id.*

   c.    "There are no other initials on the supplemental commercial computer software restricted rights dated April 17, 1998 in [the Contract]." *Id.*

   d.    "The supplemental commercial computer software restricted rights dated April 17, 1998 in [the Software License] contain none of the hand written markings that appear in the supplemental commercial computer software restricted rights in [the Contract]." *Id.*

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

e. *"During March and May of 2013 [the time of the breach], Meyer, Sikes, and Moroney were government contractors, and therefore non-government personnel." Id.*

53.     The CO admitted, however, that the USMC was "unable to independently locate or obtain the original Contract, (Ex. E, at 1)*, and presumed that the Contract was "unattainable" by the USMC because the USMC "destroyed it in the ordinary course of business." *(Ex. E, at 2.*

54.     Accordingly, despite the incorporation of FAR 52.227-19 into the Contract, the numerous references to purchase of a license by Defendant in the Contract, and his admission that USMC could not locate its copy of the Contract, the CO concluded that [t]he only lasting obligation under the contract beyond the software purchase was BNT's duty to upgrade and maintain the software from May 1998 to May 2000" and that "[a]fter June 2004 at the latest, all performance under the contract was complete, and no contractual term under the Contract cognizable under the Contract Disputes Act exists perpetually." (Ex. E, at 6).

55.     The CO also concluded that "because the acts that BNT alleges constitute a breach occurred approximately nine years after performance [was] completed and are unrelated to the government's performance duty to provide $4,218,000 in exchange for BNT delivering CLINs 0001 through 0005, the contractual duties appear intact." The CO therefore asserted that he had "no authority to satisfy the claim otherwise." (Ex. E, at. 6).

56.     The failure of the Government to retain a copy of the Contract, or the included Software License, may not be used as a pretext to find that the Government has no continuing obligations to protect Plaintiff's commercial Software. The terms and conditions of the Contract incorporate the Software License Agreement, including FAR 52.227-19.  Nothing in the Software License or FAR

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

52.227-19 provides an end date for the Government's duties and obligations concerning the Software, nor is there anything in the Contract, elsewhere in the FAR, or the Defense Federal Acquisition Regulation Supplement ("DFARS"), that permits the Defendant to treat Plaintiff's valuable Software as if it were in the public domain.

57.     The USMC is under a mandate from the DoD to protect Plaintiff from precisely the type of breach Plaintiff alleges in this Complaint.  Pursuant to the DFARS, "a supplement to the FAR that provides DoD-specific acquisition regulations that DoD acquisition officials and those contractors doing business with DoD **must** follow in the procurement process for goods and services,[2]" the USMC was and is subject to DoD Policy concerning "Commercial computer software and commercial computer software documentation" found at DFARS Subpart 227-7202.

58.     Pursuant to DFARS Subpart 227-7202:

> (a)  Commercial computer software or commercial computer software documentation **shall be acquired under the licenses customarily provided to the public** unless such licenses are inconsistent with Federal procurement law or do not otherwise satisfy user needs.

> (b)  Commercial computer software and commercial computer software documentation shall be obtained competitively, to the maximum extent practicable, using firm-fixed-price contracts or firm-fixed-priced orders under available pricing schedules.

> (c)  Offerors and contractors **shall not be required to**—

> (1)  Furnish technical information related to commercial computer software or commercial computer software documentation that is not customarily provided to the public except for information documenting the specific modifications made at Government expense to such software or documentation to meet the requirements of a Government solicitation; or

> (2)  **Relinquish to, or otherwise provide, the Government rights to use, modify, reproduce, release, perform, display, or disclose commercial computer software or commercial computer software documentation except for a transfer of rights mutually agreed upon.**

---

[2]  DCAA.mil (emphasis added).

17

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

DFARS 227.7202-1 (Emphasis added).

59.    The CO also failed to provide any support for his implied argument that the Government is not liable for breach of the Contract if the activities constituting breach were undertaken by "government contractors" (Meyer, Sikes, and Moroney), because these contractors were "non-government personnel."

60.    The Decision does not dispute that the government contractors were working in their capacity as contractors during relevant periods.  Every federal government contractor is required to "conduct themselves with the highest degree of integrity and honesty," however.  FAR 3.1002(a). If the USMC believes these contractors acted unethically and/or illegally, it has an obligation to provide Plaintiff with its records of dealings with these contractors, including copies of their contracts and all correspondence between the USMC and the contractors concerning the Software.  Since the breach occurred relatively recently, presumably the USMC has not destroyed these records in the regular course of its records retention and destruction protocols.

61.    Nothing in the FAR, the DFARS, or the Contract, absolves the USMC of its responsibility for the security of Plaintiff's Software, or from its contractual duties and obligations under the Software License Agreement, or under U.S. Copyright Law.

## COUNT I
## BREACH OF CONTRACT (SOFTWARE LICENSE)

62.    Plaintiff adopts and realleges the allegations set forth in Paragraphs 1 through 61.

63.    When the United States Government provided un-protected copies of the Software to the ROK and Jordan in breach of the terms of the Software License, these non-dongled copies of the Software did not include technical means of preventing further copying and distribution.  For all intents and purposes, in or around May 2013, the United States Government gave the Software to the armed forces of the ROK and Jordan "for free" (i.e., without any compensation to Plaintiff), for use thereafter

18

throughout these nations' armed forces as they conducted integrated operations and planning with United States armed forces. The ROK and Jordan thereby received benefits associated with a national license of the Software, without the burden of complying with terms of a national license, and without providing any compensation to Plaintiff.

64. Plaintiff (and BNT-Denmark) always sell national licenses of the Software accompanied by support and maintenance service contracts for the Software, which obligate the licensee to pay an annual fee known as a Software Upgrade and Maintenance Assessment, or "SUMA." ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████ The Contract's Software License incorporates a SUMA. (Ex. B, at 14; Ex. C, at. 2).

65. The Software License granted to the USMC was unlimited and perpetual, as were the restrictions stated in the license terms prohibiting the government from giving, selling, licensing or otherwise providing copies of the Software to any third party or to governments of foreign countries. (*See* Ex. B, at 13; Ex. C, at 2). Nothing in the Contract or Software License Agreement suggests that the U.S. Government may transfer the Software to a foreign government after the term of the SUMA, or after any other period of time.

66. Despite the fact that nothing in the Contract states or implies that the Software License is anything but perpetual, in his written determination the Contracting Officer opines that "no contractual term under the Contract cognizable under the Contract Disputes Act exists perpetually," (Ex. E, at 6*)*. Contrary to the conclusion of the Contracting Officer, the Software License is perpetual and the Government remains contractually obligated to respect the restrictions stated in that license for at least

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

as long as the government continues to use the subject software. It is uncontroverted that the DoD continues to deploy and actively use the Software.

67.     BNT-US and its corporate parent have an established pricing history from sales of national licenses for the Software to such countries as ██████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████

68.     As set forth in more detail in the Claim (Ex. D), the net profit that Plaintiff would have earned by selling national licenses to ROK and Jordan, had the Government not breached the Software License by giving the Software to these defense forces without compensation to Plaintiff, is $21,752,227.

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

WHEREFORE, Plaintiff prays for entry of judgment in favor of Plaintiff and against the United States Government:

A.    In an amount of $21,752,227, plus interest; and in addition:

B.    In the amount of Plaintiff' reasonable attorneys' fees and costs incurred in this action; and in addition:

C.    For such other and further relief as the Court deems just and proper.


## COUNT II
## <u>VIOLATION OF UNITED STATES COPYRIGHT ACT</u>

69.    Plaintiff adopts and realleges the allegations set forth in Paragraphs 1 through 68.

70.    The transfer of the Software to ROK and Jordanian armed forces was undertaken in breach of the Contract's Software License, and without permission of the owner of the copyrights of the material in the Software's code, instruction manuals, screen display, maps, visuals, artwork, or other original work of authorship fixed in the Software, as defined in the United States Copyright Act. *17 U.S.C. §102.*  These rights also extend to derivative works and compilations.  *17 U.S.C. §103.*

71.    BNT-Denmark is the proprietor of registered copyrights in the United States on the computer code within the Software, including both the computer code as it existed within the Software on the date of its original publication in 1999 (U.S. Copyright Reg. No. TX0007836490) and also the modifications to that software code undertaken between the time of its initial publication and the date on which the acts of infringement alleged in this Complaint took place (U.S. Copyright Reg. No. TX0007836500).  As the owner and registrant of the copyrights of the above material, BNT-Denmark enjoys "a bundle of exclusive rights" under Section 106 of the Copyright Act, *Harper & Row,*

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

*Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985), including the right to copy, the right to publish, the right to distribute an author's work, and the right to prepare derivative works. *A.V. v. iParadigms*, LLC, 562 F.3d 630, 636 (4th Cir. 2009); *Trandes Corp. v. Guy F. Atkinson Company*, 996 F.2d 659 (4th Cir. 1993). These rights vest in the author of an original work from the time of its creation. *Harper & Row*, 471 U.S. at 547. Anyone who violates any of the exclusive rights of the copyright owner, that is, anyone who trespasses into his exclusive domain by using or authorizing the use of the copyrighted work . . . "is an infringer of the copyright." *Sony Corp. of America v. Universal City Studios, Inc*., 464 U.S. 417, 433, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984) (quoting 17 U.S.C. § 501(a)); *iParadigms*, LLC, 562 F.3d at 636; *EMI April Music, Inc. v. White*, 618 F.Supp.2d 497 (E.D. Va. 2009).

72.     The Government's violation of the Copyright Act was undertaken in contradiction of BNT-Denmark's exclusive right to determine whether and when to copy these works, *17 U.S.C. §106*, and its exclusive right to determine whether and when to distribute these works. Where registration of a copyright is undertaken by one entity in a parent-subsidiary relationship, but reproduction and publishing is undertaken by the other entity in such relationship, both the parent and the subsidiary may enforce the copyright if the non-registrant party is a the real party in interest, or if the non-registrant party has a joint interest sufficient to require a necessary joinder. *Peter Pan Fabrics, Inc. v. Acadia Company*, 173 F. Supp. 292 (D. NY 1959).

73.     The unauthorized transfer of the original software code (U.S. Copyright Reg. No. TX0007836490), and the updates and improvements to that code (U.S. Copyright Reg. No. TX0007836500), to ROK and Jordanian armed forces resulted in loss of revenue and profit to Bruhn

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

NewTech from licensing fees, loss of control of the copying and distribution of the Software, and inability to stop further damages from occurring due to further copying and distribution of the Software.

74.     Copyright owners are entitled to remedies for copyright infringement that include injunctive relief, impounding of infringing works and copies, damages for lost profits, statutory damages, attorney fees. *17 U.S.C. §501-507; Trandes Corp. v. Guy F. Atkinson Company*, 996 F.2d 655 (4th Cir. 1993).  The Government, and its officers or employees acting in their official capacity, are not immune, under the Eleventh Amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit by any person, including any governmental or nongovernmental entity, for a violation of any of the exclusive rights of a copyright owner. *17 U.S.C. §511*.

75.     Bruhn NewTech has sustained, and will continue to sustain, injury, loss and damage to its ownership rights in the Software, and is accordingly entitled to recover from the Government damages sustained as a result of the Government's acts.  As set forth above, Plaintiff has sustained lost profits of $21,752,227 from the Government's infringement of the BNT-Demark copyright, as well as the reasonable attorneys' fees expended in pursuing its Claim.

WHEREFORE, Plaintiff prays for entry of judgment in favor of Plaintiff and against the United States Government:

A.     In an amount of $21,752,227, plus interest; and in addition:

B.     In the amount of Plaintiff' reasonable attorneys' fees and costs incurred in this action; and in addition:

C.     For such other and further relief as the Court deems just and proper.

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

## COUNT III
## VIOLATION OF THE UNIFORM TRADE SECRETS ACT

76.     Plaintiff adopts and realleges the allegations set forth in Paragraphs 1 through 75.

77.     The Software is a computer program that derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.   If the Software were permitted to be distributed beyond licensees to third parties, through unauthorized copying, the market for licensing the Software to nations or armed forces that are not already licensees of the Software would be substantially harmed or destroyed.

78.     Plaintiff has taken reasonable steps to protect the secrecy of the code that is included within the Software.  Plaintiff has distributed the software only in secure dongled form, or in un-dongled form secured by written national licenses limiting its use and further distribution.  Plaintiff has marked all distributed copies of the Software as being subject to copyright. When the Software is installed on hardware, a JWARN installer screen informs the user of the terms of license under which the Software may be used or distributed.  A screen shot of this pop-up window, and the text that is set forth in that window for Software that is installed on U.S. Government computers, are reflected in Exhibit G. Following installation of the Software, the license terms remain visible to users through the "About" screen of the software interface.  A screen shot of this post-installation display of the license terms is set forth in Exhibit H.  The copyrighted nature of the Software is further communicated within sales contracts with licensees of the Software.

79.     As such, the Software is composed of computer code that is a protectable trade secret of Plaintiff.

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

80. By distributing the Software to third parties without the permission of Plaintiff, the United States Government thereby improperly disclosed the trade secrets of Plaintiff without the consent of Plaintiff.

81. At the time of this disclosure, the United States Government knew or had reason to know that its knowledge and possession of these trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of these trade secrets and to limit use of these trade secrets.

82. At the time of this disclosure, the United States Government knew it owed a duty to maintain the secrecy or to limit use of these trade secrets.

83. The United States Government's unauthorized distribution of Plaintiff' trade secrets to third parties without permission from Plaintiff was undertaken willfully and maliciously.

WHEREFORE, Plaintiff pray for entry of judgment in favor of Plaintiff, and against the United States Government:

A. In the amount of the actual loss to Plaintiff caused by the United States Government's disclosure of Plaintiff's trade secrets, in the amount of $21,752,227, plus interest; and in the alternative:

B. In the amount of the unjust enrichment to the United States Government resulting from its disclosure of Plaintiff's trade secrets, plus interest; and in the alterative

C. In the amount of a reasonable royalty for the United States Government's unauthorized disclosure of Plaintiff's trade secrets; and in addition

D. For exemplary damages in an amount equal to twice the amount that is awarded by the court for direct damages; and in addition

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**

E.     In the amount of Plaintiff's reasonable attorneys' fees and costs incurred in this action;

and in addition

F.     For such other and further relief as the Court deems just and proper.

Respectfully submitted,

s/Steven J. Lewicky

DATE: June 30, 2016

_____

Steven J. Lewicky, Esq.
slewicky@darslaw.com
Davis, Agnor, Rapaport & Skalny, LLC
10211 Wincopin Circle, Suite 600
Columbia, Maryland 21044
(410) 995-5800 (Telephone)
(410) 309-6161 (Facsimile)
*Attorney for Plaintiff*
*Lead Attorney to be Noticed*

Meagan O'Connor, Esq.
moconnor@darslaw.com
Davis, Agnor, Rapaport & Skalny, LLC
10211 Wincopin Circle, Suite 600
Columbia, Maryland 21044
(410) 995-5800 (Telephone)
(410) 309-6161 (Facsimile)
*Of Counsel for Plaintiff*

Janine S. Benton, Esq.
Benton Potter & Murdock, P.c.
400 South Maple Avenue, Suite 210
Falls Church, VA 22046
(703) 992-6840 (Telephone)
(800) 727-0368 (Facsimile)
*Of Counsel for Plaintiff*

**Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order**